In re Lawrence A. KELLEY aka/dba
L.A. Kelley, Jr., and Frances L.
Kelley, Debtors.

NesSMITH ELECTRIC COMPANY,
INC., a Florida Corporation,
Plaintiff,

v.

Lawrence A. KELLEY aka/dba L.A.
Kelley, Jr., and Frances L.
Kelley, Defendants.

Bankruptcy No. 86–01339–BKC–J–7.
Adv. No. 87–20.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Feb. 23, 1988.

Adam G. Adams, III, Jacksonville, Fla., for plaintiff.

Albert H. Mickler, Jacksonville, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This adversary proceeding came before the Court seeking to have certain debts excepted from discharge under 11 U.S.C. Section 523(a)(4). A trial was held December 30, 1987, and upon the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Defendant, Lawrence A. Kelley ("Kelley"), owns, as joint tenant with his wife, Frances L. Kelley, 80 percent of all authorized and issued stock of Consulting Associates, Inc. ("Consulting").

2. Abney Construction Company ("Abney") is a wholly owned subsidiary of Consulting.

3. On or about September 15, 1982, the State of Florida Department of Health and Rehabilitative Services ("HRS"), as owner, contracted with Abney, as general contractor, to erect a 24 bed intermediate care facility in Jacksonville, Florida, known as State Project No. HRS–4018–K, Cluster Facility ("Cluster Facility Project").

4. In furtherance of the Cluster Facility Project, NesSmith Electrical Company, Inc. ("plaintiff"), Abney, Consulting and the Kelleys entered into a joint venture agreement, wherein plaintiff agreed to lend its credit with Transamerica Insurance Company ("Surety") to permit issuance of performance and payment bonds in favor of HRS for the project so that Abney could qualify to work on the project.

5. In consideration of this arrangement, Abney, Consulting and the Kelleys jointly and severally agreed to indemnify plaintiff and surety for all losses occasioned by issuance of the payment and performance bonds.

6. Pursuant to the terms of the agreement, plaintiff executed an application for performance and payment bonds and indemnity agreement with the surety. Under the terms of the indemnification agreement, plaintiff agreed to indemnify the surety for any claims against the surety arising out of the issuance of the payment and performance bonds on behalf of Abney in connection with the Cluster Facility Project.

7. Abney defaulted under the terms of its contract with HRS and was terminated from the Cluster Facility Project.

8. Numerous persons and entities supplying labor, services or materials to the Cluster Facility Projects made valid claims against the Surety under the labor and material payment bond.

9. Subsequent to its termination, Abney received a final draw from HRS in the amount of $89,661.63 for labor, services

and materials furnished to the Cluster Facility Project by its subcontractors, laborers and materialmen.

10. The funds received by Abney were not segregated but were co-mingled with funds received from other projects. Consequently, a portion of the final draw was used to pay some of Abney's other debts, including a $25,000 payment to Southeast Bank and a $12,851.25 payment to itself for contractor's overhead.

11. Neither the terms of the joint venture agreement between Abney and NesSmith or the terms of the payment and performance bonds issued by Transamerica required the segregation of any construction project proceeds for the payment of materialmen and subcontractors.

12. Kelley testified that the $25,000 check to Southeast Bank was deposited into an interest bearing account in order to maximize the return on idle funds. Abney's ledger account corroborates such testimony and shows numerous deposits and withdrawals corresponding to its business needs.

13. Due to Abney's default on the Cluster Facility Project, plaintiff was required to pay to or on behalf of the surety the total sum of $107,170.11 in satisfaction of its claim against the payment bond in accordance with its obligation to indemnify surety.

14. Plaintiff now seeks to recover a portion of those losses by filing a complaint objecting to defendant's discharge pursuant to Section 523(a)(4). Specifically, plaintiff argues that it was required to pay $37,851.25 to or on behalf of the surety in satisfaction of claims against the payment bond that it would not have had to pay if Kelley, acting as an officer of Abney, had applied the $25,000 check and the $12,851.25 check towards payment of those entities supplying labor, services or materials to the Cluster Facility Project.

15. Plaintiff asserts two grounds under 11 U.S.C. Section 523(a)(4) for excepting this debt from discharge:

1. Defalcation while acting in a fiduciary capacity; and

2. Embezzlement.

16. The complaint against Frances A. Kelley was dismissed by separate order on September 4, 1987. Her husband, Lawrence A. Kelley, remains as sole defendant.

## CONCLUSIONS OF LAW

1. The exceptions of Section 523 are to prevent a debtor from avoiding, through bankruptcy, the consequences of wrongful conduct.

One such exception is set forth in Section 523(a)(4), which provides:

(a) A discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt ...

(b) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; [1]

Thus, in order for plaintiff to prevail in this action, it must (1) prove that the Kelleys (i) committed fraud or defalcation (ii) while acting in a fiduciary capacity, or (2) prove that they are guilty of larceny or embezzlement.

### I. Fiduciary Relationship

2. A fiduciary relationship is one arising under both law and equity wherein one party places a special confidence in another and the latter is bound in equity and in good conscience to act in good faith and in the best interest of the former.

3. Here, the plaintiff has argued that the terms of the joint venture agreement gave rise to such a fiduciary relationship between NesSmith, Kelley, Abney and Consulting.

4. A "joint adventure" has been described by the Florida Supreme Court as "a partnership of limited scope ordinarily terminated when the objects of its creation have been accomplished." *Kislak v. Kreedian*, 95 So.2d 510, 514 (Fla.1957). Here,

---

1. Although Section 523(a)(4) does not specify that debts arising from misappropriation by a fiduciary shall be excepted from discharge, the term 'defalcation' subsumes misappropriation. *In re Materetsky*, 28 B.R. 499, 502 (Bkrptcy.S.D. N.Y.1983).

NesSmith, Kelley, Abney and Consulting entered into the joint venture agreement strictly to enable Kelley and his affiliated companies to obtain payment and performance bonds for the Cluster Facility Project, without which Abney might not have obtained the right to contract for the project.

The joint venture by and between plaintiff, Kelley, Abney and Consulting required the Kelleys individually and in their corporate capacity to indemnify plaintiff should it suffer losses under the terms of its agreement with Surety. This contractual arrangement fits the classic definition of a joint adventure and the drafter of the agreement accurately depicted it as such.

5. Under Florida law, joint venturers are "co-partners" who owe one another "the duty of the finest and highest loyalty" so long as the joint venture continues. *Donahue v. Davis*, 68 So.2d 163, 171 (Fla. 1953). Says another Florida court, "Joint venturers owe each other the utmost good faith, fairness and honesty and this is especially true of the venturer who is entrusted with the control of the property of the venture." *Reaves v. Hembree*, 330 So.2d 747, 749 (Fla. 1st DCA 1976), citing *Donahue, supra*.

6. However, most federal courts now recognize that the question of whether a debtor is a fiduciary under Section 523(a)(4) is a question of federal law, not state. *In re Black*, 787 F.2d 503, 506 (10th Cir.1986); *In re Johnson*, 691 F.2d 249, 251 (6th Cir. 1982); *Matter of Angelle*, 610 F.2d 1335 (5th Cir.1980). Following this reasoning, such courts have now found the traditional meaning of the term "fiduciary"—relationship involving confidence, trust and good faith—to be far too broad for bankruptcy purposes. *See Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844); *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Matter of Angelle*, 610 F.2d 1335 (5th Cir.1980).

Consequently, the scope of "fiduciary relationship" has been narrowed so that it now includes only express or technical trusts. Says the U.S. Supreme Court:

In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of trust. But this is not the relation spoken of in the [Bankruptcy Act].... The Act speaks of technical trusts, and not those which the law implies from contract.

*Chapman v. Forsyth, supra*, 43 U.S. at 207, 11 L.Ed. at 238.

7. The elements necessary to create an express or "technical" trust include (1) sufficient words to create a trust, (2) a clearly defined trust res, and (3) an intent to create a trust relationship. *In re Twitchell*, 72 B.R. 431, 434 (Bkrptcy.C.D. Utah 1987); *In re Kwiat*, 62 B.R. 818, 821 (Bkrptcy.D.Mass.1986). Most Courts would also require that the trust or fiduciary duty be in existence prior to the act from which the debt arose. *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986); *In re Romero*, 535 F.2d 618, 621 (10th Cir. 1976). In other words, the debtor must have been a trustee or fiduciary before the wrong and not a trustee *ex maleficio*. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *In re Short*, 818 F.2d 693 (9th Cir. 1987); *Ragsdale v. Haller, supra*.

8. Although constructive or implied trusts are specifically excluded from the definition of fiduciary relationship under bankruptcy law, statutory trusts may be found to establish such a relationship so long as they meet requirements set forth above. Plaintiff has argued that Section 713.34(3), Florida Statutes (1985), creates such a trust. That statute provides:

Any person, firm, corporation or agent, officer or employee thereof who, with intent to defraud, shall use the proceeds of any payment made to him on account of improving certain real property for any other purpose than to pay for labor or services performed on or material furnished for this specific improvement, while any amount for which he may be or become liable for such labor, services or

materials remains unpaid shall be guilty of embezzlement.

■ 9. However, it is this Court's belief that a statute which makes the act of misappropriating funds a crime, without requiring those funds to be segregated at the outset, is insufficient to create a trust for purposes of Section 523(a)(4).[2] *See In re Boyle,* 819 F.2d 583 (5th Cir.1987); *Matter of Cross,* 666 F.2d 873 (5th Cir.1982); *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980); *In re Myers,* 52 B.R. 901 (Bkrptcy.D.Vir. 1985); *Matter of McCraney,* 63 B.R. 64 (Bkrptcy.N.D.Ala.1986) (listing of dischargeability cases in the various circuits).

The Court is aware of other decisions which have addressed this problem and have reached a contrary result, but finds them unpersuasive. *In re Johnson,* 691 F.2d 249 (6th Cir.1982); *In re Romero,* 535 F.2d 618 (10th Cir.1976); *Matter of Thomas,* 729 F.2d 502 (7th Cir.1984).

■ 10. Moreover, assuming arguendo that Florida's materialmen's lien statute did create a statutory trust, the trust would have arisen out of the misappropriation itself and would not have existed prior to the wrongful act. Under most interpretations of Section 523(a)(4), this would be insufficient to create a fiduciary relationship for purposes of dischargeability. *In re Myers,* 52 B.R. 901 (Bkrptcy.E.D.Vir. 1985); *In re Barwick,* 24 B.R. 703 (Bkrptcy.E.D.Vir.1982).

■ 11. The Court notes that a number of those cases where discharge was denied involved claims by subcontractors or materialmen directly against the debtor. That is not the case here, instead, the Court is faced with a claim by a business partner for losses incurred when it had to reimburse the surety for claims against the payment and performance bonds. This does not appear to be the type of transaction which statutes such as Section 713.34 were designed to protect.

The Court has difficulty understanding how this differs from an ordinary commercial transaction wherein one party assumes a risk of loss and prices that into the contract. As such, plaintiff's cause of action would give rise to a claim in bankruptcy but not an exception to discharge.

## II. *Defalcation*

■ 12. Defalcation has been defined as a failure to account for money or property that has been entrusted to another. *In re Twitchell,* 72 B.R. 431 (Bkrptcy.D.Utah 1987); *In re Wolfington,* 48 B.R. 920, 923 (Bkrptcy.E.D.Pa.1985). The term is often used to describe a broad variety of misfeasance and its scope is generally held to be much broader than either embezzlement or misappropriation. *See In re Weaver,* 41 B.R. 649 (Bkrptcy.W.D.Okla.1984); *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937). Furthermore, defalcation is determined by an objective standard, with no element of intent or bad faith needing to be shown. *See In re Gonzales,* 22 B.R. 58 (Bkrptcy.App. 9th Cir. 1982).

13. Defalcation is a difficult concept and might explain why courts have had such a difficult time defining its scope. For example, in *In re Johnson,* 691 F.2d 249, 257 (6th Cir.1982), the court held that "the objective fact that monies paid into the building contract fund were used for purposes other than to pay laborers, subcontractors or materialmen first is sufficient to constitute defalcation [under 11 U.S.C. Section 523(a)(4)]. So long as the use was not the result of mere negligence or a mistake of fact...." Conversely, in *In re Waters,* 20 B.R. 277, 280 (Bkrptcy.W. D.Tex.1982), the court found that a "simple

---

**2.** It is interesting to note that the Florida Legislature amended Chapter 713, Florida Statutes, in 1987 to create Section 713.347. That statute provides:

**Funds to be held in trust.**

Any contractor, subcontractor, or sub-subcontractor who receives funds which are owed by that person directly to a subcontractor, sub-subcontractor, materialman, or other lienor under this part shall hold such funds in trust for such subcontractor, subcontractor, materialman, or other lienor and shall not use such funds for any other purpose. This section does not apply when the the contractor has a legal or equitable interest in the property which interest is attachable under this chapter.

failure to account for funds ... will render the ensuing debt nondischargeable...." The same result was reached in *In re Cowley*, 35 B.R. 526 (Bkrptcy.D.Kan.1983), when that court stated that defalcation "is the slightest misconduct, and it may not involve misconduct at all." 35 B.R. at 529.

14. Fortunately, the Court having already determined that there was no fiduciary relationship between the parties, need not reach a resolution of this issue. We add, however, that the debtor has satisfactorily explained the appropriation of the funds received on the project by tracing those funds to a bank account with Southeast Bank and to contractor's overhead. While the Court may question the wisdom and legality of a contractor's payment to itself while materialmen remain unpaid, it will not interfere with the defendant's business judgment as to where it could obtain the best return on invested funds.

### III. Embezzlement

15. Embezzlement has been defined for dischargeability purposes as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895); *In re Barwick*, 24 B.R. 703, 706 (Bkrptcy.E.D.Vir.1982). Unlike defalcation while acting in a fiduciary capacity, 11 U.S.C. Section 523(a)(4) does not require the existence of a fiduciary relationship in order to establish that a debt created by an act of embezzlement is nondischargeable. *In re Rigsby*, 18 B.R. 518, 520 (Bkrptcy.E.D.Vir.1982). However, it does require a showing of fraud or fraudulent intent. *In re Myers*, 52 B.R. 901, 905 (Bkrptcy.E.D. Vir.1985).

16. Even though this proceeding implies some type of trust arising out of the business relationship between the parties, the subsequent appropriation of funds by the defendant will not constitute embezzlement without proof of his fraudulent intent. *Matter of Storms*, 28 B.R. 761, 765 (Bkrptcy.E.D.N.C.1983). Furthermore, the showing of fraudulent intent which is a prerequisite to a finding of embezzlement under Section 523(a)(4) may be negated by a showing that the defendant used such funds openly and without concealment.

17. Here, the record is totally devoid of any proof of fraudulent intent. Instead, the debtor has testified that he sought a higher return on his money and that he needed to use the construction proceeds to pay off other debts. While an inference may be drawn from these actions that he intended to benefit some creditors at the expense of others, this hardly amounts to clear and convincing evidence of a fraudulent intent.

18. As was the case with defalcation while in a fiduciary capacity, the Court is hard-pressed to find any specific entrustment for embezzlement purposes other than the ordinary commercial relationship between the parties. There was no requirement that the construction proceeds be segregated or held in trust for plaintiff's benefit. Had the plaintiff been a materialman or subcontractor, the Court might have reached a different result as the Florida Legislature has provided them with special protection. *See* Section 713.-34(3), Florida Statutes. However, the Court finds NesSmith to be an ordinary creditor whose losses give rise to a claim in bankruptcy and not to an exception to discharge.

19. The Court is also influenced in its decision by the fact that the defendant did not attempt to conceal its transfers. The Court accepts the defendant's letter to Transamerica, dated July 30, 1984, as evidence of this fact. In that letter, defendant explained exactly where the funds were and why they were used in that way. The Court finds this sufficient to rebut the implication of fraudulent intent.

### IV. Conclusion

The Court has considered this matter carefully and has determined that the debtor is entitled to the full protection of his discharge. The debt which plaintiff seeks to have excepted from discharge is one which arose by virtue of an ordinary debt-

or-creditor relationship and not from any fiduciary duty. As such, defendant is entitled to his "fresh start" from bankruptcy without the weight of an excepted debt.

The plaintiff has failed in its obligation to prove (1) defalcation in a fiduciary capacity, and (2) embezzlement. Accordingly, the Court will enter a separate final judgment in favor of defendant.

### FINAL JUDGMENT

Upon Findings of Fact and Conclusions of Law separately entered, the Court ADJUDGES as follows:

1. The complaint is dismissed;

2. The indebtedness owed by the defendants to the plaintiff is covered by the bankruptcy discharge and the plaintiff is permanently enjoined from enforcing its indebtedness.