**In re John IAQUINTA, Debtor.**

**STANDARD BANK & TRUST
COMPANY, Plaintiff,**

v.

**JOHN IAQUINTA & Hamilton Moses,
Trustee, Defendants.**

Bankruptcy No. 87 B 16734.
Adv. No. 88 A 00102.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Jan. 12, 1989.

Mark E. Burt, Wolin & Rosen, Chicago, Ill., for defendant John Iaquinta.

James ·B. Carroll, Evergreen Park, Ill., for plaintiff Standard Bank & Trust Co.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This adversary proceeding comes before the Court on the amended complaint of Standard Bank & Trust Company (the "Bank") for a determination of the dischargeability of certain debts owed it by debtor defendant John Iaquinta ("Iaquinta") for violations of Section 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code. For the reasons set forth below, the Court having considered all the pleadings and evidence adduced at trial by way of testimony and exhibits, does hereby sustain a portion of the Bank's dischargeability complaint against Iaquinta based on section 523(a)(6) but denies the other relief sought under section 523(a)(2)(A) and (a)(4).

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this adversary proceeding pursuant to 28 U.S.C. § 1334 and General Orders of the United States District Court for the Northern District of Illinois. This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## II. FACTS AND BACKGROUND

The Bank is engaged in business as an Illinois banking corporation with its principal banking house in Evergreen Park, Illinois. Iaquinta was a shareholder and officer of Rocket Auto Sales, Inc. ("Rocket"). Rocket started business in 1983 and was engaged in the business of buying and selling used cars. It was formed, operated, and controlled by Iaquinta and his brother Peter. On or about February 4, 1987, Iaquinta personally guaranteed under certain terms and conditions a secured business note (the "note") renewing prior unpaid loans in favor of the Bank on behalf of Rocket.[1]

Both Iaquinta and Rocket experienced financial reverses and Iaquinta filed a Chapter 7 petition on November 12, 1987. Thereafter, defendant Hamilton Moses ("Moses") was appointed trustee of the estate. On February 11, 1988, the Bank filed its original complaint to determine dischargeability under section 523(a)(2)(A) and (a)(4). Subsequently, the complaint was amended to include a cause of action under section 523(a)(6). The Bank seeks a determination that the full unpaid balance of the note is nondischargeable.

The substance of the Bank's amended complaint is that prior to September, 1987, although there were permitted sales and substitution of the used motor vehicles which were the Bank's collateral for which the Bank held the title certificates, Iaquin-

---

**1.** The relevant portions of the note made by Rocket granted the Bank a security interest in certain motor vehicles listed on a separate exhibit. Portions of the note state: "Undersigned covenants, represents and agrees with Lender as follows: (a) that Undersigned is the sole owner of the collateral free from any lien, security interest, encumbrance or claim and will defend the collateral against the claims and demands of all persons; and (b) that Undersigned will not

sell, lease or encumber the collateral or grant any subsequent security interest therein nor part with possession thereof; ...." Iaquinta's personal unconditional guarantee was contained on the reverse side of the note and contained the typical covenants and agreements by which he agreed to pay the note in full plus all costs, expenses and attorney's fees incurred by the holder of the note in collecting the debt and in enforcing the guarantee.

ta, without the Bank's consent, knowledge or authority, sold approximately seven of the remaining ten vehicles. The Bank further alleges that Iaquinta used the proceeds for his own benefit without remitting same to the Bank, thereby damaging the Bank and wrongfully converting its collateral. The Bank claims that Iaquinta acted willfully, intentionally, maliciously, and with a fraudulent intent. The Bank contends that his actions constituted defalcation of a trust relationship and fiduciary obligations he owed the Bank. The damages claimed by the Bank exceed $41,-000.00 plus costs and attorneys' fees. Iaquinta denied the substantive allegations of the complaint.

### III. DISCUSSION

#### A. *Dischargeability Standards in the Seventh Circuit*

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *In re Martin,* 698 F.2d 883, 887 (7th Cir.1983). The standard of proof under section 523(a)(2), (a)(4) and (a)(6) is one of "clear and convincing evidence." *In re Bogstad,* 779 F.2d 370, 373 (7th Cir.1985). The discharge provisions of section 523 are construed strictly against a creditor and liberally in favor of a debtor. *In re Pochel,* 64 B.R. 82, 84 (Bankr.C.D.Ill. 1986). *See generally* 3 *Collier on Bankruptcy,* § 523.08[4] (15th ed. 1988).

#### B. *11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides as follows:
(a) A discharge under section 727, 1141, 1228(a), 1128(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.        .        .        .        .

(2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

In order to except Iaquinta's debt from discharge under this section, the Bank must establish three elements: (1) Iaquinta obtained the money or credit through representations either knowingly false or made with such reckless disregard for the truth as to constitute willful misrepresentation; (2) Iaquinta possessed an actual intent to defraud; and (3) the Bank actually and reasonably relied upon the false representation. *In re Kimzey,* 761 F.2d 421, 423 (7th Cir.1985); *In re Garman,* 643 F.2d 1252, 1256 (7th Cir.1980).

For purposes of section 523(a)(2)(A), the timing of the fraud is critical. The Bank's evidence relative to Iaquinta's alleged fraudulent conduct focused on the disposition of the Bank's collateral and the admitted failure to remit either the sale proceeds of the seven vehicles or substitute other titles to the Bank. Most of these sales and transactions occurred after the execution of the note. To recover under section 523(a)(2)(A), the Bank must prove by clear and convincing evidence that Iaquinta's fraud existed and occurred at the time the refinancing took place. *In re Vissers,* 21 B.R. 638, 640 (Bankr.E.D.Wis.1982); 3 *Collier on Bankruptcy* ¶ 523.08 at 523.49 (15th ed. 1988). Subsequent misrepresentations or fraud will have no effect upon the discharge of the debtor. Ginsberg *Bankruptcy,* ¶ 11,304 at 11,035 (1985). Ensuing conduct contrary to a former representation by the debtor does not establish that the original representation was false. *In re Potter,* 88 B.R. 851, 852 (Bankr.N.D.Ill.1988). Thus, the Bank failed to prove the first element under section 523(a)(2)(A).

Similarly, the Bank's proof was deficient concerning the second element. The evidence did not clearly and convincingly establish that Iaquinta possessed an actual intent to defraud at the time his guarantee was given to the Bank. His guarantee and other covenants contained in the note constituted a promise to perform future acts. *In re Martin,* 70 B.R. 146, 150 (Bankr.M.D. Ala.1986). His consequent breach of such promise is not sufficient to constitute fraud. Although some of Iaquinta's conduct bears indicia of a fraudulent intent,

such as the granting of a subsequent security interest in one of the Bank's collateral vehicles to another bank, this evidence does not clearly show that Iaquinta possessed a fraudulent intent at the time the note was executed.

■ The Bank's proof on the third element is likewise insufficient. Actual reliance may be shown by unchallenged testimony that a creditor would not have extended that credit had it known the truth. *In re Kreps,* 700 F.2d 372, 376 (7th Cir. 1983). Although the Bank may have actually relied on Iaquinta's representations at the time the note was executed, the Bank has not met the reasonable reliance standard. The standard for measuring the reasonableness of a creditor's reliance is an objective one. In *In re Mitchell,* 70 B.R. 524 (Bankr.N.D.Ill.1987), Judge Schmetterer set out a three-prong test to decide whether a creditor's reliance was in fact reasonable. Although *Mitchell* was a section 523(a)(2)(B) case, the Court finds that the reasonable reliance test set forth therein is applicable to section 523(a)(2)(A) as well. The following three factors must be considered when determining if reliance was reasonable: 1) the creditor's standard practices in evaluating credit worthiness; 2) the standards or customs of the creditor's industry in evaluating credit worthiness; and 3) the surrounding circumstances existing at the time of the debtor's application for credit. *Mitchell,* 70 B.R. at 527–528.

■ The evidence did not clearly establish what the Bank's standard practices were in evaluating credit-worthiness of borrowers like Rocket and Iaquinta. *In re Ardelean,* 28 B.R. 299, 301–302 (Bankr.N.D.Ill.1983). Furthermore, the Bank's proof did not include a showing that it then conducted any commercially reasonable investigation of Rocket or Iaquinta in accordance with usual standards or customs of the commercial banking industry. The exception potentially excusing some investigation of credit worthiness because of a longstanding favorable credit relationship between the parties appears inapplicable. *See Garman,* 643 F.2d at 1257–1259;

*Kreps,* 700 F.2d at 376. The testimony at trial was that the Bank insisted the note had to be fully secured because neither Rocket nor Iaquinta qualified for any unsecured credit. This is the type of red flag that should have routinely spurred some investigation. *See, e.g., Bogstad,* 779 F.2d at 372–373 N. 4. The Bank took no action to verify the situation and circumstances until the note became delinquent in August 1987. If reasonableness requires verification, then a creditor cannot be said to have acted reasonably if no verification took place. *In re Smigel,* 90 B.R. 935, 937–940 (Bankr.N.D.Ill.1988). Accordingly, the Court must deny the relief sought by the Bank under section 523(a)(2)(A).

### C. *11 U.S.C. § 523(a)(4)*

■ Section 523(a)(4) provides that debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny" are not dischargeable. 11 U.S.C. § 523(a)(4). Resolution of the issue of who is a fiduciary is to be determined under federal law. *Potter,* 88 B.R. at 853; *In re Short,* 818 F.2d 693, 695 (9th Cir. 1987). In order for a debtor to be considered a fiduciary for purposes of section 523(a)(4), he must have been the trustee of an express or technical trust. *Kwiat v. Doucette,* 81 B.R. 184, 188 (D.Mass.1987); *Matter of Campbell,* 79 B.R. 496, 498 (Bankr.M.D.Fla.1986). The cases interpreting section 523(a)(4) have held that it only applies to "express trusts" not to implied or constructive and resulting trusts that arise by operation of law. *In re Interstate Agency, Inc.,* 760 F.2d 121, 124 (6th Cir. 1985); *In re Wolfington,* 48 B.R. 920, 923 (Bankr.E.D.Pa.1985); *In re Holman,* 42 B.R. 848, 851 (Bankr.E.D.Mo.1984).

The courts have developed a narrow interpretation of what constitutes a fiduciary relationship. The term fiduciary capacity has been limited so as not to apply to debtor-creditor relationships. *In re Mullins,* 64 B.R. 287, 290 (Bankr.W.D.Va.1986), *aff'd,* 848 F.2d 184 (1988). The trust or the fiduciary relation must have been in existence prior to the act from which the debt arose. *Ragsdale v. Haller,* 780 F.2d 794,

796 (9th Cir.1986); *In re Kelley,* 84 B.R. 225, 229 (Bankr.M.D.Fla.1988). The debtor must have been a trustee before the wrong and not a trustee *ex maleficio. Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153–154, 79 L.Ed. 393 (1934).

The elements which the Bank must prove under section 523(a)(4) in order to establish nondischargeability of Iaquinta's debts are: 1) there was an express trust relationship to the property at issue; 2) Iaquinta acted in a fiduciary capacity towards the Bank; and 3) Iaquinta breached this relationship. *Interstate Agency, Inc.,* 760 F.2d at 124. The documentary evidence adduced at trial fails to establish the existence of an express trust. Moreover, Iaquinta's fiduciary obligations were owed to Rocket, not the Bank. Under Illinois law, a corporate officer is a fiduciary of his corporation. *Shlensky v. South Parkway Building Corp.,* 166 N.E.2d 793, 19 Ill.2d 268 (1960). Unless proceeds from the sale of property can be traced to an officer or director, he is not liable under this theory. *In re Nicoll,* 42 B.R. 87, 89 (Bankr.N.D.Ill.1984). No such tracing was proven in this case.

■ The case at bar is similar to *Mullins.* The *Mullins* court found that a debtor-creditor relationship consisting of a floor plan financing of used car inventory, also secured by a guarantee from the debtor, did not constitute a trust arrangement for purposes of section 523(a)(4). Similarly, in the instant case, the Court finds that Iaquinta and the Bank had a debtor-creditor relationship which does not comprise a trust arrangement.

Defalcation for purposes of section 523(a)(4) has been defined as a failure to account for money or property that has been entrusted to another. *In re Twitchell,* 72 B.R. 431, 434 (Bankr.D.Utah 1987); *Wolfington,* 48 B.R. at 923. An objective standard is used to determine defalcation, with no intent or bad faith needed. *See In re Gonzales,* 22 B.R. 58, 59 (B.A.P. 9th Cir.1982). The scope of defalcation is broader than embezzlement or misappropriation. *See In re Weaver,* 41 B.R. 649, 651 (Bankr.W.D.Okla.1984). The Court has already determined that there was no fiduci-

ary relationship between Iaquinta and the Bank. Therefore, no defalcation under section 523(a)(4) can be found.

Counsel for the Bank in closing arguments stated that Iaquinta embezzled from Rocket. He argued that those proceeds from the sale of the motor vehicles that were not used to purchase other motor vehicles or remitted to the Bank constituted an embezzlement. Embezzlement under section 523(a)(4) has been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, and it requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud." *United States Life Title Insurance Company of New York v. Dohm,* 19 B.R. 134, 138 (N.D.Ill.1982).

■ A fiduciary relationship need not be established in order to find a debt nondischargeable by an act of embezzlement. *In re Beasley,* 62 B.R. 653, 654 (Bankr.W.D. Mo.1986); *In re Rigsby,* 18 B.R. 518, 520 (Bankr.E.D.Vir.1982). The showing of actual fraudulent intent is a prerequisite to a finding of embezzlement. *Kelley,* 84 B.R. at 231; *In re Myers,* 52 B.R. 901, 905 (Bankr.E.D.Vir.1985). A showing of fraudulent intent may be negated by a showing that the debtor used the funds openly and without concealment. *Kelley,* 84 B.R. at 231.

■ The Court is unable to find any embezzlement from the Bank or Rocket on the part of Iaquinta. Iaquinta testified that the sale proceeds of the vehicles were used to pay Rocket's operating expenses. Iaquinta openly and without concealment used the proceeds to pay other debts. While he may have intended to benefit some creditors at the expense of the Bank, this does not amount to clear and convincing evidence of a fraudulent intent directed at the Bank. The mere fact that he used the vehicle sale proceeds to pay Rocket's other bills does not in and of itself constitute an embezzlement from either the Bank or Rocket. Thus, the Court will deny the relief sought under section 523(a)(4).

### D.  *11 U.S.C. § 523(a)(6)*

Section 523(a)(6) provides:

> (a) A discharge under Section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> .    .    .    .    .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

In order for a debt to be held nondischargeable under section 523(a)(6), the creditor has the burden of proving that the injury resulted from an act that was both willful and malicious; *Kimzey*, 761 F.2d at 425; *United Bank of Southgate v. Nelson*, 35 B.R. 766, 768 (N.D.Ill.1983); *In re Hopkins*, 82 B.R. 952, 953 (Bankr.N.D.Ill.1988). The term "willful" means "deliberate or intentional," and "malicious" means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will." *In re Condict*, 71 B.R. 485, 487 (N.D.Ill.1987). The debtor need not act with ill will or malevolent purpose toward the injured party. *In re Hallahan*, 78 B.R. 547, 550 (Bankr.C.D.Ill. 1987). Thus, "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." 3 *Collier on Bankruptcy* ¶ 523.16 at 523–117 (15th ed. 1988). The phrase "willful and malicious injury" encompasses "willful and malicious conversion." *In re Meyer*, 7 B.R. 932, 933 (Bankr.N.D.Ill.1981).

■■■ The Court has carefully considered all of the evidence and the testimony of the witnesses. Iaquinta admitted that he controlled Rocket's business and negotiated the note for Rocket. He knew that the Bank's collateral position would be impaired when he sold some of the Bank's collateral without remitting the proceeds or tendering substitute motor vehicle titles of equivalent value. Iaquinta admitted his conversion of some of the collateral. Unlike the fraudulent intent requirement of section 523(a)(2), the willful and malicious requirement of section 523(a)(6) neither requires a showing of reasonable reliance by the Bank nor does it focus on Iaquinta's scienter at the time of the extension of credit. Rather, the scienter requirement under section 523(a)(6) is directed at the time injury occurred to the property. In this case, that time occurred when Iaquinta sold the Bank's collateral and failed to remit either the sale proceeds to the Bank or substitute motor vehicle titles for vehicles of equivalent value.

Earlier decisions from this court have held that where a debtor knowingly converted a secured creditor's property and thereby deprived the creditor of its collateral, the debtor's act was both willful, malicious and hence nondischargeable under section 523(a)(6). *In re Scotella*, 18 B.R. 975, 976–977 (Bankr.N.D.Ill.1983). Under Illinois law, the tort of conversion includes an unauthorized act by which the owner or one having a right of property in the personal property is deprived of same. *See* 35 Illinois Law and Practice, *Trover and Conversion*, §§ 2, 3, and 7 (1983 and 1988 Supp.) and cases cited therein. Business persons are frequently presumed to know that harm will result from conversion of a secured party's collateral and a debtor who actively participates in such a conversion is personally liable. *Nicoll*, 42 B.R. at 90.

In this case, the evidence is clear and convincing that Iaquinta had substantial experience in the used car business. He personally handled the sales of two vehicles subject to the Bank's security interest. Iaquinta did not remit either the sales proceeds or substitute titles. He admitted he had read and understood the significance of the note and guarantee. Iaquinta's actions in selling two of the vehicles were not mere innocent or technical conversions. Neither the informal course of dealing between the parties nor the Bank's failure to monitor the collateral can serve to negate the security interest granted the Bank and excuse his conversions. The documentary evidence is clear that he acted as Rocket's salesman for a 1977 Mercedes sold on May 30, 1987, for $8,000.00 (as shown by Bank's Exhibit 4I) and a 1976 Mercedes sold on January 13, 1987, for $6,500.00 (as shown by Bank's Exhibit 4P).

Both vehicles were subject to the Bank's security interest as shown by Bank's Exhibits 1A, 2E and 2L. Other exhibits show that the remaining five vehicles were sold by different agents of Rocket, including Jack Weldon, Peter Iaquinta and Michelle Cornwall.

Under Illinois law an individual, who personally or by an agent converts property of another, even though not personally benefitted, may be liable for the conversion. *See* 35 Illinois Law and Practice, *Trover and Conversion*, § 8 (1983 and Supp.1988) and cases cited therein. The inquiry under section 523(a)(6), however, must concentrate on Iaquinta's actions. There is no evidence that clearly and convincingly establishes that the Rocket agents acted specifically at Iaquinta's direction or for his individual benefit regarding the sale of those five vehicles. Therefore, the Court will not impute those individuals' actions to Iaquinta. The evidence showed Iaquinta's absence from Rocket for some period in the summer of 1987 when his brother operated the business after the two parted company. When Iaquinta sold the two Mercedes and failed to remit either the proceeds or substitute vehicle titles to the Bank, he converted that property. As for the other five vehicles, the evidence was not clear relative to whether Iaquinta actively participated in the sale and the resulting conversion of those vehicles. This result appears to be in accord with the policy of the Bankruptcy Code which affords the debtor a fresh start.

### 1. *Damages Under Section 523(a)(6)*

Because a portion of the Bank's debt is nondischargeable, the Court must determine the appropriate measure of damages. The fair market value of the converted collateral is the appropriate measure of damages for conversion. *In re Krause*, 44 B.R. 159, 163 (Bankr.N.D.Ill.1984). The sale prices of the two Mercedes is the only evidence of the fair market values concerning these two vehicles. Accordingly, the total aggregate gross sale prices of $14,-500.00 is nondischargeable. *Krause* notes that statutory interest (five percent per annum) can accrue from the time of conver-

sion where there has been an unreasonable and vexatious delay of payment. *See also* 35 Illinois Law and Practice, *Trover and Conversion*, § 16; 15 Illinois Law and Practice, *Damages*, §§ 63, 65; Ill.Rev.Stat. ch. 17, para. 6402 (1987).

### E. *Recovery of Attorney's Fees and Expenses*

The Bank also seeks recovery of its attorney's fees and other miscellaneous unpaid expenses. Although the note and guarantee held by the Bank authorizes collection of all costs and reasonable attorney's fees, there is no provision for such award under section 523. Only assessment and taxation of a reasonable debtor's attorney's fees for dischargeability cases involving consumer debts under section 523(a)(2) are allowed under section 523(d). *In re Crosslin*, 14 B.R. 656, 658 (Bankr.M.D. Tenn.1981), awarded attorney's fees under the contract with the debtor to a successful creditor who proved a case under section 523(a)(2)(A). The contrary view was espoused in *In re Woods*, 25 B.R. 16 (Bankr. D.Or.1982). *Woods* specifically noted that the legislative history behind section 523(d) is unevenhanded in favor of the debtor not the creditor. 25 B.R. at 17–18. In the instant case, however, the Bank has not met its burden of proof under section 523(a)(2)(A).

Federal courts, in awarding attorney's fees, have generally applied what has been referred to as the "American Rule." That rule provides that in cases based upon or involving federal law, attorney's fees are not allowable absent a statutory basis or aggravated conduct justifying imposition of attorney's fees. The Bank's action is founded on that federal statutory cause of action sounding in tort rather than arising solely under its underlying contract with Iaquinta. Therefore, the attorney's fee provision in both the note and the guarantee are not controlling. The Bank's awardable damages are limited to the value of its collateral on the date of Iaquinta's conversion, plus statutory interest. The Bank is not entitled to the full balance due under the note and guarantee. Because the remedy created by the Bankruptcy Code does

not give the Bank a statutory right to attorney's fees, this Court declines to tax Iaquinta with attorney's fees notwithstanding the fact they were well earned by the Bank's counsel who ably tried a difficult case. This result is consistent with other decisions of other courts. *See In re Penney,* 76 B.R. 160, 162 (Bankr.N.D.Cal.1987); *In re Johnson,* 756 F.2d 738, 741 (9th Cir. 1985). *See also, Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975) (award of attorney's fees in federal litigation reversed as contrary to the "American Rule").

### F.  *Federal Rule of Civil Procedure 41(b)*

Iaquinta has moved for findings in his favor and dismissal of the adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7041 and Federal Rule of Civil Procedure 41(b). Rule 41(b) provides in pertinent part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a) ...

Fed.R.Civ.P. 41(b); Fed.R.Bankr.P. 7041.

Iaquinta's motion is well-taken in part and will be so allowed, but is denied in part for the two Mercedes motor vehicles.

### IV.  CONCLUSION

For the foregoing reasons, the Court hereby allows Iaquinta's motion for dismissal as to the Bank's complaint for relief under section 523(a)(2)(A) and (a)(4) and part of its complaint under section 523(a)(6). The Court hereby denies Iaquin-

ta's motion in part as to the relief sought by the Bank under section 523(a)(6). Iaquinta's debt to the Bank in the amount of $14,500.00 plus statutory interest and costs on the two Mercedes motor vehicles is nondischargeable.

This Opinion is to serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.